## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re:<br><br>QUINTESS, LLC, a Delaware corporation,<br><br>               Debtor. | Case No. 16-19955-JGR<br><br>Chapter 11 |

## VERIFIED MOTION FOR CONFIRMATION OF DEBTOR'S PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION AND RELATED RELIEF

Quintess, LLC, debtor and debtor in possession herein ("Debtor"), hereby files its motion ("Motion") for confirmation of its Prepackaged Chapter 11 Plan of Reorganization, as modified by the Amended Plan of Reorganization ("Plan"). As discussed below, the Plan complies with all of the requirements for confirmation under Sections 1129(a) and (b) of the Bankruptcy Code and should, therefore, be confirmed.

### I.     INTRODUCTION

This bankruptcy and the Plan follows a long and significant process undertaken by the Debtor and its management to restructure the Debtor's unsustainable liabilities and stay in business. At this point in time, without a speedy confirmation and implementation of the Plan, the Debtor will have no choice but to cease operation of its business which will result in no recovery to any unsecured creditor.

As detailed below, months prior to this case, the Debtor developed a financial scenario which would allow for a restructuring of its existing liabilities and ensure business operation and profitability. This scenario was memorialized in a plan of reorganization which was presented to all of its creditors as a "prepackaged plan." The creditors overwhelmingly voted in favor of the "prepackaged plan" and the treatments of their claims as proposed therein.

While the initial financial scenario originally described in the "prepackaged plan" has been modified, the modified terms actually benefit the Debtor's unsecured creditors and afford an overwhelmingly better treatment of their claims.

As demonstrated below, the "prepackaged plan" is (i) in the overwhelming best interest of creditors and the estate; (ii) feasible; and (iii) supported by the Debtor's creditors.  There is no superior alternative.  The Debtor diligently and painstakingly developed and proposed the plan to its members, and raised necessary financing commitments that the Debtor cannot utilize for the benefit of its operations and members until the plan is approved.  An expedited and streamlined process to plan approval is therefore critical to the Debtor's ability to reorganize its affairs, resume sales of its products and services, and remain in business.

Based on all of the facts and circumstances of this case, and the evidence presented by the Debtor in support of the Motion, the Debtor respectfully requests that the Court confirm the Plan.

## II.        STATEMENT OF FACTS

### A.    <u>Background</u>.

On October <u>7</u>, 2016 ("<u>Petition Date</u>"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtor has continued to operate its business and manage its affairs as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor is in the business of selling memberships in a luxury destination club operating under the names "Quintess" and "Quintess Collection" (also referred to herein as the "<u>Club</u>"). The Debtor was formed in 2004, and as a result of various mergers, the Debtor came to be owned by Club Holdings, LLC.  ("<u>CH</u>").  In 2015, CH formed Vacation Group, LLC, a Delaware limited liability company ("<u>VG</u>") as a new subsidiary, and CH contributed all of its interest in the Debtor, Time & Place, LLC, a Delaware limited liability company ("<u>T&P</u>") and Whim Travels, LLC, a Delaware limited liability company ("<u>Whim</u>") to VG, as the sole owner

of all three of these entities.  T&P and Whim are sister companies of the Debtor and operate separate businesses within the vacation rental space.

**B.**     **The Debtor's Business.**

The Club offers prospective members multiple options for membership plans.  To purchase a Club membership, members pay a one-time deposit and annual dues in exchange for the right to make reservations for travel in the Club's portfolio of vacation properties and to receive hosting, travel planning, house cleaning and similar services in connection with stays at those properties.  The amount that a new member is required to pay as a deposit and other terms of the membership vary based on the membership plan chosen (such as holiday and non-holiday plans and plans with varying usage rights).  The properties are located in sought-after resort, leisure, recreational and city destinations, and often have access to amenities that may be available.  The properties vary in size, quality, services and appointments.  Members select the properties that they wish and the times they wish to use them, based on availability on a first-come first-served basis, subject to booking parameters and other procedures designed to promote fairness of access.  Memberships are typically purchased by sophisticated, wealthy consumers of luxury travel, who have the financial means to pay a deposit to activate and annual dues to maintain their memberships.

Historically, from 2004 through 2012, the deposit was refundable to the member upon the member's resignation from the Club and satisfaction of conditions set forth in that member's membership agreement, which conditions include being placed on the Club's resignation list in the order that resignation requests are received and the Club selling new memberships and receiving deposits for those new memberships before the membership at the top of the resignation list can be retired.  In 2011, the Club began to sell memberships where the required membership deposit was entirely non-refundable and the amount of the required deposit was reduced to coincide with the deposit being non-refundable.  After 2011, the Club stopped selling memberships with refundable deposits completely and sold memberships with non-refundable deposits only.  The deposit price has fluctuated over time as market conditions and industry

trends have changed.  Following 2012, the price of a membership deposit ranged from a high of $250,000 in 2012 for a 21-28 night flex holiday membership to a low of $53,000 in 2015 for a 21-28 night flex membership.

The change from refundable to non-refundable deposits was due to difficulty in selling memberships at high price points during the economic recession and the years that followed and was consistent with practices of similar businesses in the industry at that time.  Through this change, the Debtor had hoped to encourage new sales in an increasingly competitive marketplace and highly sensitive cost-conscious consumer environment.

In 2014, deposit pricing decreased again, reflecting competitive pressures, primarily from new players in the marketplace, under a different model that allowed for them to charge a much lower entry price.  These alternative memberships in these new clubs could be purchased for a fraction of the price of the Quintess membership, making further price cutting a necessity.  In 2014, the deposit price for a typical 21-28 night holiday flex membership in Quintess dropped to approximately $125,000 in 2014 and continued to drop to approximately $53,000 in 2015.

In addition to paying the deposit, members also pay annual dues in advance of each membership year.  The amount of the annual dues is a per night amount multiplied by the number of nights in the plan.  The per night dues have also changed over time. Generally, as deposit pricing decreased, per night dues pricing increased.  The reduction of deposit pricing together with increases in dues pricing was part of an overall transition strategy to position the Debtor as a fee-based hospitality services company which, as further described below, became necessary for the Debtor to survive in the changing marketplace.

**C.**     **Evolution of the Debtor's Business Model.**

The Debtor is owned by VG, which is owned by CH.  CH was originally organized as a real estate investment business based on real estate appreciation.  From approximately 2004 through 2011, CH invested in real estate assets (the properties that the members used for vacations) financed with a combination of membership deposits received from membership sales

(which typically provided a down payment) and real estate debt secured by the properties being purchased.

The business model of CH (and the group of real estate holding companies) was based on acquisition of real estate and appreciation of real estate assets. As new memberships in the Club were sold, real estate assets were expected to be refinanced and upgraded, while their values appreciated. However, the effects on the Club of the economic recession which began in 2008 were profound. Chaos in financial markets and plummeting real estate values impaired the Club's assets and ability to raise capital. Employment losses and declines in disposable income led to a dramatic decline of new membership sales (and the deposit income associated therewith) and rapid increases of members seeking to resign from the Club and joining the Club's resignation list, as current and prospective members re-evaluated their own discretionary spending. Financial hardship resulted not only to the Club, but also to the entire destination club industry. Even with decreased membership deposit pricing, new membership sales did not significantly recover, and pricing continued to drop, with the most significant drop in pricing occurring in 2014 and thereafter as the industry evolved and competitive forces and technology advances provided for cheaper alternatives forcing pricing further downward. Most destination clubs in existence in 2008 were either acquired or perished.

To address these economic forces, in December of 2008, the Debtor (and its parent companies) went through a restructuring without the use of bankruptcy protection. This restructuring involved amendments to membership contracts to modify or eliminate provisions of those contracts that were not sustainable, substantial expense and debt reductions, increased equity capital commitments from investors, and reinventing its business to be more nimble and flexible while increasing travel opportunities and experiences for its club members and non-club member clients.

**D.** **Sale of Real Estate Portfolio and Elimination of Debt.**

Despite the precipitous drop in real estate value, Quintess held onto the real estate portfolio for as long as it could, but eventually had to sell the real estate in order to contain real

estate expenses which were destructive to the Club and in order to pay off debt.  Losses in real estate value took time to present themselves because shortly after the market crash in 2008, a dearth in real estate transactions made finding comparable sales for purposes of valuation extremely difficult and unreliable.  Eventually, however, the confluence of four main factors forced the Debtor to sell the real estate portfolio:  1) the value of the homes did significantly depreciate; 2) the cost to own the properties, and especially debt service, drained valuable resources and made owning the homes unsustainable and impaired the Club's ability to provide services; 3) CH had to raise equity investment just to fund the ongoing debt service, but was unable to pay the debt service absent continued equity investment; and 4) the loans that the real estate secured came due in 2012 with the lender unwilling to modify them.  These four factors made continuing to own the real estate implausible and detrimental to the Debtor's business. The Debtor eventually reached agreement with its primary lender to pay off the debt by selling the real estate portfolio by the end of 2012.  Following the payoff of the primary debt line, from 2013 to the present, the Debtor has sold all of its remaining real estate and paid off all corresponding secured debt. In doing so, the Debtor paid off approximately $150 million in debt and has $0 in real estate secured debt today.  However, the properties were sold for less than the price Quintess paid for them, and although the resulting sales proceeds were enough to pay off the debt, the proceeds were not sufficient to pay deposit refunds or equity holders.

**E.** **New Products to Increase Revenue.**

In 2012, and in order to sustain its business, the Debtor developed new products to increase its revenue.  One new product was to market and sell trial memberships, which did not require a membership deposit, but required only dues.  These trial memberships lasted only a limited period of time; often just long enough for the member to take one or two trips, after which the membership terminated.

Also, in 2013-14, the Debtor began selling a new product known as a "Club Card" which was similar to a trial membership in that it required zero deposit, where all amounts paid were paid in advance.  Club Cards expired after a specified period of time (usually between 3 and 5

years), and the holders of a Club Card paid a premium dues rate per night that exceeded the rates paid by members.  Furthermore, Club Card holders had limited rights to book reservations within the Club's holiday periods.

In 2015, VG entered into an agreement with a home exchange which provided for VG to make nights in Quintess that were otherwise going unused available to the home exchange's members in exchange for access to weeks in the home exchange's properties that could be used by Quintess members.  This allowed for the Debtor to maximize high-season travel options for its members in exchange for use of property that otherwise would have gone under-utilized.

The Club also began to offer its members the ability to purchase additional nights on an a la carte basis in excess of the plan nights included in their membership.  Members were granted the ability to purchase certain additional nights by paying an additional dues amount.

The Club also allows nights in its properties to be purchased by non-members if the properties are not reserved by members after defined periods of time when members' reserving the properties has become unlikely.  This allows the Debtor to monetize nights that otherwise would fall off the calendar unused and wasted.

In order to increase revenue, the Debtor also began to market and sell to its members, specialized itineraries for experiential travel, such as excursions, treks, retreats, cruises and safaris, under the name "Quintess Adventures".  These adventures provide an alternative type of travel to traditional Quintess vacations because they are typically more exotic and experience-based, are generally all-inclusive (in that the trip cost covers food and other costs other than lodging) and are procured from third-party tour operators.  The Club makes Quintess Adventures available to its members and allows the members to pay a portion of the price for the adventure from annual dues that the member is already paying.  Because these adventures are generally more expensive on a nightly basis than typical Quintess vacations, these adventures are priced on a variable basis and any differences between the cost of the adventure and the amount the member is allowed to use annual dues to pay is paid by the member in cash.  Quintess pays the third-party tour operator after receiving payment from the member.

7

1. **Time & Place/Expanded Travel Opportunities.**

In October of 2012, CH acquired T&P, a start-up company in the villa rental space.  T&P represents owners of second homes and attempts to rent these properties, earning a commission on each rental.  This business is not connected to the Club, except that T&P and the Debtor have agreed that Quintess members may purchase nights in T&P's inventory of homes paying a portion of the cost of the trip using Quintess dues.  In doing so, Quintess members can enjoy an expanded portfolio of vacation alternatives utilizing annual dues that the member is already paying to pay for a portion of these trips.  T&P currently manages, directly or indirectly, online marketing for a portfolio of over 600 properties worldwide due to direct relationships with homeowners and indirect relationships with third party property exchanges and agencies.  T&P inventory is available for rent by Quintess members and other clients.  Each time a Quintess member uses annual dues to pay for a portion of a T&P trip, Quintess pays T&P a fee to cover that trip.

2. **Whim Travels/ Short-Term Reservations.**

In 2015, CH formed Whim Travel, LLC, to launch an alternative product simply called "Whim". Like T&P, Whim is a sister company of the Debtor, also owned by VG.  Whim represents owners of vacation properties by attempting to rent those properties on a short-term booking basis, usually approximately 120-130 days in advance of the arrival date.  This strategy is a way of liquidating unused inventory that otherwise is at risk of not being rented at all because of the short-term time frame.  Whim utilizes relationships with homeowners, their representatives and home exchange companies to build a portfolio of vacation homes that can be rented to Whim clients.  Whim uses a points system ("Whim Points") for transacting rentals.  Specifically, a portion of any trip taken in Whim can be paid for with a combination of points and a cash transaction fee.  Whim is not a membership club; its clients do not pay deposits or dues, but pay fees on a per transaction basis.

To summarize, the Debtor's current primary sources of revenue are sales of its products, and the Debtor's current products are:

8

- Club memberships in Quintess.

- Club Cards in Quintess:  rights to travel in Quintess for a specified period of time (typically 3-5 years) without a membership deposit, but at a premium nightly rate in excess of the night dues rate that club members pay.

- Quintess Adventures:  specialized trips, such as safaris, cruises, treks, tours and other adventure travel for which the member can pay for a portion of the cost of the trip using annual dues and the balance paid in cash.

- Sale of additional Quintess nights to existing Quintess members.

- Sale of underutilized nights to non-member clients.

- Time & Place:  nights in Time & Place sold by the Debtor to Quintess members, who may pay for a portion of the trip using Quintess annual dues and the remainder of the trip in cash.  Although T&P receives the funds for these sales, Quintess benefits by reduction in demand for nights in Quintess, which can then be re-sold or expense adjusted.

- Whim Points:  Quintess members may convert their membership deposit (and reduce the Net Resale Amount) into Whim Points, and if the Member gifts the points to others (including charitable donations) the member will concurrently pay cash in the amount of transaction fees prepaid for all the Points to be usable to purchase trips with Whim.

## F.      **Summary of Efforts to Address Cash Flow Issues and Summary of Current Financial Condition.**

The Debtor has worked diligently since 2008 to respond to the market conditions, remain in business and become profitable.  These efforts have included:

- Restructuring of membership contracts by member vote in December 2008 to increase dues to sustainable levels and avoid unsustainable rates of payment of deposit returns;

- Obtaining Series C Preferred financing for CH receiving investment proceeds from 2008 through 2013;

- Obtaining equity financing for CH in the form of Series D Preferred and Series E Preferred Shares;

- CH diversifying business lines in 2009, 2010, 2011, 2013 and 2014 through acquisition or development of strategic affiliated companies;

- Transforming the Debtor's business from a membership deposit dependent business to a fee-based hospitality business focused on current and deferred revenues;

- Transforming the Debtor's business away from owned property (owned by CH) to leased properties and expanded customer choices;

- Reducing operating expenses and increasing dues revenue so that dues income would eventually equal or exceed operating costs without reliance on new membership deposits;

- Reducing pricing on membership deposits to encourage new sales;

- Creating additional product offerings to encourage new sales;

- Diversifying product offerings through affiliated companies, such as T&P and Whim in order to expand products and travel opportunities to encourage new sales and enhance memberships;

- Changes in accounting treatment of deposits so that they can be accounted for as deferred revenue rather than booked as liabilities, improving the Debtor's and CH's balance sheets.

- All 4 One Program (described below) and the ability to convert deposits into Whim Points, as well as other efforts to provide alternative methods to receive or otherwise monetize the Net Resale Amount.

These efforts improved the Debtor's financial condition and finances.  However, the Debtor's financial viability continued to be burdened by further slowing of new membership

sales, increasing litigation by prior members to recover their deposits, increasing defaults of membership dues and increasing appetite to reduce membership size (and therefore annual dues) - all of which reduces annual revenues.

**G.     Issues Regarding Resignation List and Inability to Pay Net Resale Amount.**

Typically, when a member who has a refundable membership exits the Club, a portion of the membership deposit is paid back to the exiting member (the portion to be received varies among memberships). This refund is referred to by the Debtor as "Net Resale Amount."  To exit the Club, a member must submit a written resignation request, after which the membership is placed on a written resignation list in a position based on the order that the resignation request is received ("Resignation List").  Once the membership reaches the top spot on the Resignation List, the Club must thereafter sell three or more new memberships and receive deposits for those three or more memberships that equal or exceed three times the amount of the Net Resale Amount to be paid to the member at the top of the Resignation List before that member can be paid.  This process is sometimes referred to as "3 in 1 out" and is designed to assure that the Club is able to generate the income necessary to make the payments to the members without putting the viability of the Club or the deposits of the other members at risk. Members must remain in good standing and continue to pay annual dues while awaiting payment of the Net Resale Amount whether or not they have submitted a resignation request and whether or not they actually travel.  When a member receives the Net Resale Amount, the membership is terminated.

In 2010, the Club instituted a second resignation list that ran parallel to the 3 in 1 out Resignation List known as the "3 in 2 Out Resignation List".  Quintess offered to members that were then on the 3 in-1-Out Resignation List the ability to come off of that list and preserve the ability to join the 3 in 2 Out Resignation List approximately 3 years later.  This had the effect of delaying resignations for those who accepted the proposal for three years and also reducing the 3 in 1 out Resignation list.  As of the Petition Date, both lists are in effect and have members on them. These two lists work concurrently so that when the sales threshold necessary for payment of the Net Resale Amount for the first member on the 3 in 1 Out Resignation List is satisfied,

then both the member at the top of the 3 in 1 Out Resignation list and the member on the 3 in 2 Out Resignation List are paid their respective Net Resale Amounts.  By having both lists work concurrently, the Club pays Net Resale Amounts to two members instead of one each time the sales threshold is achieved.  Because the sales threshold is essentially $3 of deposits that must be received for each $1 of Net Resale Amount for the first resigning member on the 3-in-1 Out Resignation List, and the first resigning member on the 3 in 2 Out Resignation list, in effect, the Debtor must pay out $2 for every $3 of deposits collected.  After factoring in the costs of sale, the Club retains very little, if any, proceeds from deposits collected from membership sales.  The Resignation Lists currently have approximately 152 members (133 on the 3 in 1 Out Resignation List and 19 on the 3 in 2 Out Resignation List).

Not surprisingly, the pace of the payment of the Net Resale Amounts have been and continue to be very slow because the pace of new memberships sales has been very slow.  Given the delays associated with paying the Net Resale Amounts, over the years since the economic crisis that began in 2008, the Debtor has instituted numerous programs designed to help members with dues relief or recouping their deposits, without the Club paying the deposits, which the Club cannot feasibly do and without prejudicing other members.  The first effort began in 2009, as a consignment program, which allowed members to purchase additional nights from one another.  This provided dues relief in that a member selling nights could effectively lower their dues obligation without going into default of their membership.

Also, beginning in 2009, the Club allowed members to sell their memberships to buyers that the selling member found without assistance from the Club.  If the Club determined that the buyer was not a prospective buyer directly from the Club or that the Club would not have found that buyer without the selling member, then the selling member could sell the membership directly.  In those cases, the Club did not dictate the price, but simply allowed a private transaction to occur.

Beginning in 2011, the Club offered members the ability to restructure their memberships by eliminating any Net Resale Amount (converting the membership to non-refundable) in

exchange for greater flexibility in the number of nights in the membership.  This allowed the Club to reduce its overall exposure for Net Resale Amounts, limit the growth of the Resignation List, while providing the member with greater travel flexibility.  This program also helped members who continue to have Net Resale Amounts because it reduced the number of other members who have Net Resale Amounts.

In 2013, the Club began a new program called "All 4 One," which provided yet another way for members to recoup their deposits.  Although at the time, members had the ability to sell their entire memberships to a buyer the member found, members were having difficulty finding buyers willing to pay enough for the membership to make the transaction reasonably attractive to the selling member.  In other words, the members were not having much better luck selling memberships than the Club was.  To address this difficulty in selling by the members, the Club permitted members to break their memberships into smaller pieces and sell pieces of their memberships.  By selling a portion of the membership, the member was able to recoup some portion of the deposit and retain a smaller membership as a result.  This All 4 One program allowed (i) the member the ability to receive a significant portion of the amount paid by the buyer (the Club receiving a small portion) and to reduce annual dues commitment, (ii) the Club to reduce the overall Net Resale Amount by the amount paid to the selling member by the new member; (iii) the Club to welcome a new dues-paying member; and (iv) the new member to join the Club on terms the new member could accept.

Finally, in 2015, the Club has created the ability for members to monetize the deposit paid by applying it toward travel in Whim.  Currently, Quintess members have the ability to convert their membership deposits into Whim Points at an agreed upon rate of exchange.  Each time a Quintess member converts a portion of the membership deposit into Whim Points the Net Resale Amount for that member is reduced by the amount of the deposit so converted.  Currently, both refundable and non-refundable deposits can be converted into Whim Points.  Once the Quintess member receives the Whim Points, the points can be spent on Whim trips in Whim properties.  Furthermore, because the points are transferable, the Quintess member can

gift the points to friends and family, use them for business purposes or donate them to qualified charitable organizations, who can then auction the points at fund-raising events. This new program provides an alternative way to monetize the membership deposit so that the member is able to obtain value from the deposit without going through the Resignation List process. In effect, the deposit becomes monetized into a currency that can be used for travel in Whim.

Notwithstanding all of these efforts to address the slow pace of payment of Net Resale Amounts, certain members of the Club have instituted litigation or arbitration against the Debtor demanding immediate payment of their respective Net Resale Amounts and other alleged damages regardless of their position on the Resignation List. Over the years, these suits (or threats of suits) have continued and the Debtor has been able to negotiate acceptable settlements in some of those cases. Currently, there is one active case of a member suit and/or threats of a suit (four other suits were recently arbitrated and those arbitrations have been completed). The remaining active suit is currently in arbitration. Because membership deposits were used to purchase real estate and the value of the real estate imploded and did not return by the time the real estate had to be sold, the Debtor does not have sufficient cash on hand or assets to liquidate to pay judgments in these cases if it were to receive unfavorable outcomes. Furthermore, the Debtor does not have sufficient cash on hand to continue to pay legal fees it continues to incur in defending these suits. Finally, adverse rulings against the Debtor could allow these plaintiffs to leapfrog other members, which would be fundamentally unfair to members and would encourage more suits; both being unfathomable outcomes. These suits, by their very nature, damage the Club and its members for the intended benefit of very few.

As a result of the significant decrease in the Debtor's sales, difficulty in increasing the pace of sales which can in turn increase the pace of payment of Net Resale Amounts to resigning members and inability to pay judgments that could result from litigation, even if unlikely, and after significant consideration of all of the Debtor's options, the Debtor determined that it desperately needed to restructure its financial obligations, and that the best manner of effectuating a restructuring would be through a Chapter 11 bankruptcy process.

### III.    PREPACKAGED PLAN PROCESS

By the middle of 2016, the Debtor was experiencing significant cash flow pressures and began to prepare for a Chapter 11 proceeding which it felt was inevitable.  However, without a continuing revenue stream (consisting primarily of annual dues and sales of travel products and new memberships with deposits), and/or commitments of funding (in the form or loans, capital or both), the Debtor did not believe that it could stay in business during a Chapter 11 bankruptcy proceeding and survive after exiting Chapter 11.  Fortunately for the Debtor, CH agreed to extend loans to the Debtor on a secured basis and the Debtor was able to raise voluntary assessments and annual dues from its members, which enabled the Debtor to bridge its operating shortfalls until the Debtor was able to secure the long term needed financing and attempt to reorganize through Chapter 11.

More specifically, on or about May 31, 2016, the Debtor entered into a Loan Agreement and Promissory Note whereby CH agreed to loan up to $3 million to the Debtor.  Pursuant to a Security Agreement, the Debtor granted CH a lien and security interest upon substantially all of the Debtor's assets as security for its obligations to CH.  The material loan documents between the Debtor and CH are attached to the motion filed by the Debtor concurrently herewith seeking approval of the Debtor's "*Stipulation (A) To Provide Post-Petition Financing, And (B) For Use Of Cash Collateral And Adequate Protection*" ("CH Stipulation") with CH.  As of the Petition Date, the Debtor's secured indebtedness to CH was approximately $2,662,500 plus accrued interest and other fees and costs, and pursuant to the CH Stipulation, CH has agreed to make an additional advance of $337,500 as provided in the parties' loan agreements.  Other than the lien asserted by CH[1], there is no other creditor with a lien on the Debtor's assets.  Member assessments were paid to the Debtor without any obligation of the Debtor to repay them.

---

[1] While the UCC-1 search reflects a purchase money security interest asserted by Dell Financial Services ("Dell"), that financing statement was recently terminated by Dell as the Debtor's obligation to Dell has been repaid.

The Debtor's assets are limited to accounts receivable (which are principally unpaid annual dues for members who have reached their anniversary date and have been billed their next year's obligation, but have not yet paid), fees for nights sold in addition to the membership dues and miscellaneous furniture, fixtures and equipment.  The Debtor owns no intellectual property, as intellectual property it uses is owned by CH.  If the Debtor is unable to reorganize its business, and must cease its business and liquidate its assets, the Debtor believes that there will be no recovery to any creditor as members will not pay dues to a closed business and the miscellaneous furniture, fixtures and equipment have minimal, if any, realizable value.

The Debtor's unsecured creditors primarily consist of (a) general claims of trade payables and other operating liabilities totaling approximately $2,500,000, (b) membership deposit refunds (Net Resale Amount) totaling approximately $118,390,539; and (c) prepaid club card fees for future travel in the amount of approximately $2,838,523.  The Debtor estimates that more than 95% of its pre-petition liabilities are attributable to member deposit obligations.

With approximately $121 million of debt associated with membership deposit refunds alone, the Debtor is burdened with massive liabilities.  In addition, the Debtor determined that it would likely require an infusion of cash ranging from $6 to $10 million to continue its business operations during and after Chapter 11, and embarked upon a vigorous campaign for months to raise the needed funding.  The Debtor has determined that it cannot raise additional funding without shedding these massive liabilities.

In order to facilitate raising necessary financing, the Debtor also decided that it would be prudent and necessary to pursue the dual path of a "prepackaged plan" process which would allow for its creditors and members to be informed as to the current state of the financial and business affairs of the Debtor and its goals for a reorganization, give creditors and members the opportunity to vote on the "prepackaged plan," and potentially minimize the time that the Debtor is in Chapter 11.

By July 15, 2016, the Debtor completed and delivered a package of its "prepackaged plan" ("Plan Package") to all of its creditors, including to all of its current members and former

members with deposit or other claims.  The Plan Package consisted of (a) cover letter, (b) the Plan of Reorganization, (c) a Disclosure Statement describing the Plan ("Disclosure Statement"), and (d) ballot for voting on the Plan.  A copy of the Plan Package is attached as **Exhibit A** to the Declaration of Pete Estler ("Estler Declaration") filed concurrently herewith in support of the Motion.

Summarily, the Plan was premised upon the Debtor raising between $6 to $10 million of financing for working capital purposes during and after the Debtor's bankruptcy, with the financing (which is to be controlled by a "Lead Investor") to convert into preferred shares in the reorganized debtor ("Reorganized Debtor") upon confirmation of the Plan ("Reorganization Financing Plan").  The Reorganization Financing Plan can be summarized as follows:

- Assuming the full $10,000,000 in financing is raised, 95,000 Common Shares and 30,000 Preferred A Shares will be available to be issued in the Reorganized Debtor upon confirmation of the Plan.

- For its secured claim against the Debtor in the amount of approximately $3,000,000, upon confirmation of the Plan, CH agreed to reconstitute the Debtor's indebtedness as part of the $10 million financing.  In addition, under the Plan, CH granted the Debtor an option to purchase T&P and Whim (and other assets, including intellectual property assets) in exchange for receiving 17,500 of the Common Shares in the Reorganized Debtor (fully dilutible) and the Debtor would have the ability to exercise the option upon confirmation of the Plan.  The Reorganized Debtor to emerge upon confirmation of the Plan would be the entity that owns the Quintess Club, T&P and Whim.  This combination of the three companies would allow for greater business efficiencies, economies of scale and product synergies.  These three entities would operate as business divisions of the Reorganized Debtor rather than separate companies.

- Of the remaining Common Shares of the Reorganized Debtor, 52,500 Common Shares will be allocated to creditors holding allowed general non-priority unsecured claims (Class 2) on a pro rata basis.  On a fully diluted basis, the total Common Shares

would be equal to 56% of the ownership stake in the Reorganized Debtor.  In addition, 25,000 Common Shares would be allocated to stock options issuable under an employee stock option plan ("ESOP") and Warrants issuable as compensation to the Lead Investor.

• Upon confirmation of the Plan, the financing controlled by the Lead Investor would convert into 30,000 Preferred A Shares (assuming a full $10,000,000 in financing is raised).  On a fully diluted basis, the total Preferred A Shares would be equal to 24% of the ownership stake in the Reorganized Debtor.

• The Reorganized Debtor would be owned on a fully diluted basis after confirmation of the Plan, assuming the full $10,000,000 in financing is raised: (i) 56% by the holders of Common Shares, (ii) 24% by the holders of Preferred A Shares, (iii) 12% of the interests reserved for employees and managers of the Reorganized Debtor under the ESOP and (iv) 8% reserved as Warrants to compensate the Lead Investor.

• Management of the Reorganized Debtor would be by a Board of Managers elected by all of the shareholders, except that three seats on the Board of Managers will be elected solely by a majority vote of the holders of the Preferred A Shares, and the remaining seats on the Board of Managers will be elected solely by a majority vote of the holders of all Common Shares; *provided, however,* that for the initial Board of Managers, the three seats to be elected by the holders of the Preferred A Shares shall be elected solely by the Lead Investor.  Any Board member elected by a specific group of holders of shares can only be removed by that specific group of holders of shares.

• The Quintess members will have their current membership agreements rejected and will be offered new memberships in the Reorganized Debtor's Quintess Collection, and the new memberships offered to the pre-petition members will not require any membership deposit, have no deposit refund or resale amount, but will require payment of annual dues.  It is intended that each Quintess member's travel usage plan and dues in effect pre-petition will be preserved to the greatest extent feasible and practical. Furthermore, existing club card contracts will also be rejected and club card holders will

18

be offered a new contract having a term greater than the remaining term of their original club card contract and allowing them to purchase nights and apply a portion of the nightly cost (up to 50%) using the current balance on their existing accounts, but no trips will be allowed unless at least 50% of the cost is paid in cash.  Notwithstanding the foregoing, all members and club card holders will be required to pay annual dues and the Debtor reserves the right to set a minimum applicable to all members who sign a contract. It is also intended that these new memberships will allow for greater product interaction among Quintess, T&P and Whim.

A total of 539 Plan Packages were mailed to creditors which included all of the Debtor's current members and former members with deposit or other claims.  The Debtor timely received ballots from 311 claimants, or 58% of the claimants who received the Plan Packages.  Of those who timely submitted ballots to the Debtor, 274 or 88% voted to accept the Plan.  Additionally, the total amount of the claims held by these claimants who voted to accept the Plan is $67,155,919 or 87% of the total claims of the 311 claimants who timely submitted ballots on the Plan.  Attached as **Exhibit B** to the Estler Declaration is a tabulation of all of the ballots timely received by the Debtor.

## IV.      EVENTS FOLLOWING THE PREPACKAGED PLAN

As aforementioned, the Plan calls for the Debtor to raise $6 million to $10 million of financing, which, upon confirmation of the Plan, would convert into Preferred A Shares.  Prior to and following the delivery of the Plan Package to creditors, the Debtor and its management worked diligently for months to obtain the level of financing envisioned under the Plan and a Lead Investor to handle the financing transaction.  Unfortunately, and despite best efforts, the Debtor experienced challenges and obstacles finding a Lead Investor and financing under the proposed Reorganization Financing Plan.

Fortunately, the Debtor received several alternative financing offers.  At least one financing offer was substantially similar to the Reorganization Financing Plan, and in the business judgment of the Debtor, was far better for the Debtor and its creditors.  This financing

offer involves Berg & Berg Enterprises, LLC, who is a large shareholder and whose principal, Carl E. Berg, is a shareholder of CH and its affiliates and is a member of the Boards of Directors of CH, VG and other related entities, and who has (either individually or through an entity owned or controlled by him) made loans to and investments in CH and its affiliates in the past. The financing offer also involves Pete Estler, who is also a shareholder and member of the Boards of Directors of CH, VG and other related entities, and the current Chief Executive Officer of the Debtor, CH, VG and other related entities. The Debtor offered to members the opportunity to participate in this financing on the same terms. Some of the members are participating in the financing.

As of the Petition Date, Mr. Berg, Mr. Estler, together with other lenders have signed commitment letters agreeing to advance at least $6 million to the Reorganized Debtor on a post-confirmation basis. The Debtor anticipates that it will end up with signed commitment letters for up to $7 million (collectively, the "Commitment Letters"). All of the lenders under the Commitment Letters are creditors and members of Quintess. While financing offers were also received from other parties, in the Debtor's business judgment, the terms of those financing offers were not as beneficial as the terms offered under the Commitment Letters and required time to negotiate. The Debtor was, however, extremely short on time to have the needed financing committed in order to pursue its restructuring goals, and it was imperative to its continuing business of handling travel reservations that the Debtor continue to collect annual dues from its current members, which, without assurances that the needed financing was committed, was placed into jeopardy.

Given Mr. Berg's, Mr. Estler's and other lenders' connections with the Debtor, these lenders were familiar with the importance of ensuring the collections of member dues and the time crunch faced by the Debtor. Fortunately for the Debtor, these lenders were willing to act very quickly, and negotiated and signed the Commitment Letters which now forms the basis for the Debtor's restructuring goals.

## V.     REQUEST FOR APPROVAL OF THE PREPACKAGED PLAN WITH MODIFICATIONS

By this Motion, the Debtor seeks to confirm the Plan, as modified to include the changes to the financing structure of the Reorganized Debtor, from the Reorganization Financing Plan to the financing called for under the Commitment Letters ("Commitment Letter Plan"), as well as other significant benefits conferred upon the Debtor's unsecured creditors.  The Debtor has prepared a modified Plan of Reorganization which reflects these changes.  The Plan which includes the modifications is attached as **Exhibit C** (clean version), and **Exhibit D** (redlined version reflecting changes from the Plan) to the Estler Declaration filed concurrently herewith. The summary of the modified Plan is as follows.

- The Debtor has received commitments from lenders to advance loans (collectively, "Loans") to the Reorganized Debtor aggregating up to $6 million upon confirmation of the Debtor's Plan.  Berg & Berg Enterprises, LLC will serve as the "Lead Lender."   The commitment by lenders to make the Loans is evidenced by the Commitment Letters which are attached to the modified Plan.

- The Loans will be made on and after the Effective Date after the Debtor has confirmed the Plan and met the other conditions to funding of the Loans as generally described in the Commitment Letters.  The proceeds of the Loans will be used to address the working capital needs of the Reorganized Debtor.

- The Loans will accrue interest at the rate of 10% per annum and interest is to be paid monthly.  The maturity date of the Loans is September 30, 2019.  The repayment of the Loans shall be secured by a first priority security interest and lien upon all assets of the Reorganized Debtor.

- If at least $1,000,000 of the Loans is funded, each lender who has fully funded its respective loan shall receive Warrants to purchase Preferred A Shares of the Reorganized Debtor.   The Warrants shall have such terms and preferences as set forth in the Reorganized Debtor's limited liability company operating agreement ("Operating

Agreement"), including, but not limited to, the right to receive a preference of 1X such lender's principal loan amount upon certain distributions and thereafter to receive distributions on a *pari passu* basis with the common shares. The Warrants shall be exercisable for a period of 5 years and shall have a strike price of fair market value at the time lender signs loan documents. The number of Preferred A Shares that may be purchased by each lender pursuant to the Warrants shall equal 21% of the total shares of the Reorganized Debtor multiplied by the lender's Percentage, subject to dilution, as shown on the Cap Tables attached to the modified Plan ("Cap Tables").

- Under the modified Plan, the entirety of all secured claims of the Debtor's only secured creditor, CH, in the amount of approximately $3,000,000 (including pre-petition and post-petition loans) shall be converted into 9,000 Preferred A Shares of the Reorganized Debtor, which is equal to 9% of the total shares of the Reorganized Debtor, subject to dilution, as shown on the Cap Tables. In addition to the foregoing, CH has granted the Debtor an option to purchase T&P and Whim (and other assets, including intellectual property assets) in exchange for receiving 17,500 of the common shares in the Reorganized Debtor (fully dilutible) and the Debtor will have the ability to exercise the option upon confirmation of the Plan. The Cap Tables attached to the modified Plan illustrate the impact of the Debtor's exercise of this option.

- Same as the prior Plan, all pre-petition membership agreements are rejected. All members who had active membership agreements as of the Petition Date will be offered new memberships in the Reorganized Debtor's Quintess Collection, and the new memberships offered to these members will not require any membership deposit, have no deposit refund or resale amount, but will require payment of annual dues. It is intended that each active Quintess member's travel usage plan and dues in effect pre-petition will be preserved to the greatest extent feasible and practical. Furthermore, existing club card contracts will also be rejected and club card holders will be offered a new contract having a term greater than the remaining term of their original club card contract and allowing

them to purchase nights and apply a portion of the nightly cost (up to 50%) using the current balance on their existing accounts, but no trips will be allowed unless at least 50% of the cost is paid in cash.  Notwithstanding the foregoing, all members and club card holders will be required to pay annual dues and the Debtor reserves the right to set a minimum applicable to all members who sign a contract.  It is also intended that these new memberships will allow for greater product interaction among Quintess, T&P and Whim.

- Creditors holding allowed general non-priority unsecured claims (Class 2) including those creditors with allowed rejection damage claims against the Debtor, will receive common shares in the Reorganized Debtor (same as the Reorganization Financing Plan) and entitled to a "Claim Credit" as follows.

    (i)    Creditors holding allowed Class 2 claims shall receive 52,500 common shares of the Reorganized Debtor on a pro rata basis; and

    (ii)    Creditors holding allowed Class 2 claims shall also be entitled to a "Claim Credit" equal to the allowed amount of their respective Class 2 claims, which shall be satisfied in the form of Whim Points, or other travel related credits or points as determined by the Reorganized Debtor in its sole and absolute discretion ("Travel Points"). The Reorganized Debtor will distribute and make available, on an annual basis, aggregate Travel Points having a retail value of not less than $1,000,000 ("Minimum Annual Travel Points"), which will be allocated on a *pro-rata* (based on the amount of their respective claims) basis among the holders of the Claim Credit. The full amount of the unused balance of the Claim Credit may be satisfied through Travel Points on and after the 30th anniversary of the Effective Date of the Plan. Satisfaction of the Claim Credit is guaranteed by VG. The Reorganized Debtor shall have the right to increase the Minimum Annual Travel Points in its sole and absolute discretion prior to the 30th anniversary of the Effective Date of the Plan. Creditors entitled to the Claim Credit will be subject to the terms of the Whim Travel Agreement and Reservation Procedures, which are attached to the Plan.

- Upon confirmation of the Plan, on a fully diluted basis, the total common shares shall be equal to 60.9% of the ownership stake in the Reorganized Debtor, consisting of (i) 52,500 common shares to general non-priority unsecured creditors, and (ii) 17,500 to CH based on the Debtor's exercise of the option to purchase T&P and Whim.   In addition, 15,000 common shares will be reserved for stock options issuable under an employee stock option plan ("ESOP") which equates to 13% ownership stake in the Reorganized Debtor on a fully diluted basis.  Finally, 26.1% of the Reorganized Debtor will be owned by holders of Preferred A Shares/Warrants on account of the conversion of CH's secured claim (9,000 Preferred A Shares) and the Warrants issued for the Loans (21,000 Preferred A Shares).

- All other terms of the Plan are preserved and unchanged in the modified Plan.

The Debtor strongly believes that the terms of the modified Plan are overwhelmingly superior to the terms of the Plan for its creditors, and, therefore, submits that the Court can confirm the Plan, as modified, without re-solicitation of votes.

The Reorganization Financing Plan called for secured convertible debt of between $6MM-$10MM, including recasting of the $3,000,000 secured claim of CH as part of this debt. This plan called for a "Lead Investor" who would have discretionary control over the funding of the loans from all lenders.  All such loans would be placed in a third-party escrow account and only released to the Debtor upon the direction of the Lead Investor in its sole and absolute discretion, with all other lenders being bound by the Lead Investor's decisions.   The Lead Investor would have authority to discontinue funding of the Debtor and to instruct the escrow agent to release the funds in escrow back to the lenders pro rata at any time.  Further, the loans may be converted into Preferred A Shares of the Reorganized Debtor, with all loans converting if determined by the Lead Investor.  Such Preferred A Shares would have a preferred return of the greater of (a) two times the amount of such lender's original loan (2x), or (b) the amount of such lender's loan (1x) plus 8% return compounded annually.   After the preference is paid, all

Preferred Shares would share in distributions with Common Shares on a *pari passu* basis.  The Lead Investor would be further compensated with Common Shares equal to 8% of the Reorganized Debtor.  However, after months of diligent efforts, the Debtor did not receive any commitments under this Reorganization Financing Plan and no lender had agreed to act as Lead Investor.

The Commitment Letter Plan calls for a secured working capital facility of between $6MM-$7MM, excluding the $3,000,000 CH secured claim, which, under this plan, would be required to be converted into Preferred A Shares having a preferred return of the amount of the loan (1x).  This plan calls for a "Lead Lender" having discretionary authority to approve draw requests made by the Debtor upon the satisfaction of certain funding conditions.  Thus, the Debtor controls the determination of whether funding is needed, subject to the approval of the Lead Lender.  Berg & Berg Enterprises, LLC has agreed to serve as the Lead Lender.  The Reorganized Debtor's draw requests are limited to the lesser of (a) total outstanding loan amounts of 30% of the trailing 12 months' GAAP revenues, or (b) $1,000,000 per draw request.  There is no third party escrow and no lender is required to fund any money until a draw request is approved by the Lead Lender.  Under this plan, there is no conversion feature, but each lender who has funded a portion of the overall loan will receive Warrants to purchase Preferred A Shares equal to the amount of that lender's loan commitment amount (with the 1x return and after the preference is paid, all Preferred Shares would share in distributions with Common Shares on a *pari passu* basis).  Exercise of the Warrants is not mandatory and each lender will independently decide whether or not to exercise the Warrants, regardless of any decision of the Lead Lender.  Once a draw request is approved, each lender will be required to fund that lender's pro rata share of the draw request (based on commitment amount).  If any lender does not fund a draw request, then the outstanding principal amount of that lender's loan will be reduced by 25% and may be converted into Common Shares and that lender's Warrants will be forfeited.  There is no lead promote or other compensation to the Lead Lender.  As of the Petition Date, the

Debtor has received funding commitments for more than the required minimum of $6,000,000 under the terms of the Commitment Letter Plan and a Lead Lender has been agreed upon.

Further comparative analyses between the Reorganization Financing Plan and the Commitment Letter Plan are provided in the document attached as **Exhibit E** to the Estler Declaration.  As the cap tables show, although the general unsecured creditors are receiving the same number of Common Shares under both plans (*i.e.,* 52,500 Common Shares), the dilutive effect under the Commitment Letter Plan is far more beneficial to these creditors as they are expected to retain 45.7% of the ownership of the Reorganized Debtor than the 42% contemplated under the Reorganization Financing Plan.  In short, the unsecured creditors will receive a greater percentage of ownership in the Reorganized Debtor based on their ownership of the Common Shares.

In addition to a greater percentage of ownership in the Reorganized Debtor, unsecured creditors will be entitled to a Claim Credit equal to the full amount of their allowed claims which will be satisfied through the Travel Points over the next 30 years.  The Travel Points essentially allow for the entire allowed claim to be satisfied in value through luxury vacations reserved through the Whim travel program, with a portion of the costs of the vacations being paid with Travel Points and the balance in cash.

The terms of the Plan, as modified, benefit creditors, and, as evidenced below, the Debtor has otherwise met all of the elements required for the Court to confirm the modified Plan.  Accordingly, the Debtor respectfully requests that the Court confirm the modified Plan without delay.

## VI.    CONFIRMATION REQUIREMENTS HAVE BEEN MET

**A.    The Plan as modified complies with all of the applicable provisions of Section 1129(a).**

As set forth more fully below, the Debtor's modified Plan should be confirmed because all of the applicable requirements of Bankruptcy Code Section 1129(a) are met.

1.        Section 1129(a)(1) of the Code.

Section 1129(a)(1) of the Code provides that a court may confirm a plan of reorganization only if "the plan complies with the applicable provisions of this title."  The phrase "applicable provisions" has been interpreted to mean Section 1122 and 1123 of the Code which govern the classification of claims and interests and the contents of a plan of reorganization. Cane v. Johns-Manville Corp., 843 F.2d 636, 648-9 (2nd Cir. 1988); In re Aspen Limousine Serv., Inc., 193 B.R. 325, 340 (D. Colo. 1996); 5 Collier on Bankruptcy 1129.02 (15th ed. 1986); H.R. Rep. No. 95-595, 9th Cong., 1st Sess. 412 (1977).

1.1        Section 1122 of the Code.

Section 1122 of the Code governs the classification of claims and interests.  Section 1122(a) requires that a plan "place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class."  The Court has broad discretion in classifying claims under Section 1122 of the Code.  In re Johnston, 21 F.3d 323, 327 (9th Cir. 1994); In re City of Colorado Springs Spring Creek Gen. Imp. Dist., 187 B.R. 683, 687 (Bankr. D. Colo. 1995).  In evaluating whether claims are "substantially similar," a bankruptcy court must evaluate the kind, species or character of each category of claim.  In re Johnston, 21 F.3d at 3287.

A plan may place substantially similar claims in different classes when a reasonable nondiscriminatory basis exists for such treatment.  In re Deming Hosp., LLC, No. 11-12-13377 TA, 2013 WL 1397458, at *3 (Bankr. D.N.M. Apr. 5, 2013) (" . . . the Court will place the burden on the plan proponent to justify any separate classification of substantially similar claims, if a party in interest objects on gerrymandering grounds."); In re City of Colorado Springs Spring Creek Gen. Imp. Dist., 187 B.R. 683, 690 (Bankr. D. Colo. 1995) ("In summary, there is no requirement in § 1122 that similar claims be classified together."); In re Montclair Retail Center, 177 B.R. 663, 665 (B.A.P. 9th Cir. 1995, citing, In re Johnston, 21 F.3d at 328; see also In re Tucson Self-Storage, Inc., 166 B.R. 892 (9th Cir. BAP 1994) (if Section 1122(a) permits classification of substantially similar claims in different classes, such classification may only be

undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims).  The burden is on the Debtor to offer a business or economic justification for the separate classification of unsecured claims, or to show a legal distinction between the claims. See In re Deming Hosp., 2013 WL 1397458, at *3; Montclair Retail Center, 177 B.R. at 665; see also Tuscon Self-Storage, 166 B.R. at 898.

In this case, the Plan designates 2 classes of claims and 1 class of interests.  Based on the foregoing principles, the classification of the allowed claims and interests, summarized as follows, is appropriate under the Plan.  The Plan contains the following classifications:

*Class 1*:                 **The allowed secured claim of Club Holdings, LLC**

*Class 2*:                 **All allowed general unsecured claims.**

*Class 3*:                 **Interest holder, Vacation Group, LLC**

All of the foregoing claims are either appropriately classified together (due to the fact that they are "substantially similar") or separately.  The Plan therefore complies with the provisions of Section 1122 of the Code.

      1.2    Section 1123(a) of the Code.

The Plan complies with the seven (7) mandatory provisions of Section 1123(a) of the Code.

Section 1123(a)(1) of the Code requires that a plan of reorganization designate classes of claims other than claims of the kind specified in Section 507(a)(1), (2) and (8) of the Code.  The Plan satisfies the requirements of Section 1123(a)(1) of the Code by designating all classes of claims other than claims specified in Sections 507(a)(1), (2) and (8) of the Code.

Section 1123(a)(2) of the Code requires that a plan of reorganization specify those classes of claims or interests that are not impaired and Section 1123(a)(3) of the Code requires that a plan specify those classes of claims or interests that are impaired.  The Plan satisfies this requirement by indicating whether each class under the Plan is impaired or not impaired.  In particular, the Plan indicates that all of the classes are impaired under the Plan.

Section 1123(a)(4) of the Code requires that a plan provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to less favorable treatment. The Plan satisfies this requirement as no claim holder or interest holder is receiving treatment under the Plan different from any other claim holder or interest holder in the same class.

Section 1123(a)(5) of the Code requires that a plan provide adequate means for the Plan's implementation. The Plan sets forth the implementation and means of execution of the Plan. In particular, the Plan provides that any funding required under the Plan will be funded by the Debtor's cash on hand as of the Effective Date of the Plan, future earnings from continued operations of the Debtor, the proceeds of the Loans, and recovery of avoidances causes of action, if any. The Plan also provides information as to the Common Shares and Preferred A Shares that creditors will receive under the Plan. The Plan also provides information as to the Claim Credit that Class 2 creditors will be entitled to under the Plan.

Section 1123(a)(6) of the Code requires that a plan provide for appropriate distribution of power among all voting equity classes. The Plan is specific as to the distribution of equity in the Reorganized Debtor to different creditors, and provides for the same and equal distribution of power among the different classes of creditors. Therefore, this provision is met.

Section 1123(a)(7) of the Code requires that a plan contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee. As the Plan as modified describes, the initial senior management of the Reorganized Debtor will be identical to the current management of the Debtor, meaning that Pete Estler will serve as the initial Chief Executive Officer of the Reorganized Debtor. The newly elected board will decide on a Chief Executive Officer going forward.

The initial manager of the Reorganized Debtor will be VG, which will have a Board of Directors consisting initially of Pete Estler, Ben Addoms, Bruce Barnet, Kevin McCarthy and Carl Berg – each of whom is currently serving as a member of CH's and VG's Boards of

Directors. These Board members will not receive any initial compensation for serving as members of the VG's Board of Directors.

As promptly as possible after the Effective Date of the Plan, the new shareholders of the Reorganized Debtor shall elect a Board of Managers consisting of five (5) directors subject to the following:

(a)      as long as any portion of the Loans made by the Lead Lender is outstanding, Lead Lender will have the right to elect three (3) of the five (5) directors on the Board of Managers ("Preferred Managers");

(b)      after all of the Loans made by the Lead Lender have been paid in full, the holders of Preferred A Shares will have the right to elect the Preferred Managers; and

(c)      notwithstanding anything to the contrary in any of the agreements pertaining to the Loans, if at the time of the election of the Board of Managers, CH is the only holder of Preferred A Shares, then all seats on the Board of Managers (including the Preferred Managers) shall be elected by all shares entitled to vote (Preferred and Common) voting together as a single class.

Under these circumstances, the proposed management of the Reorganized Debtor is consistent with the interest of creditors, the equity security holder and with public policy. Based on these and related provisions of the Plan, the Debtor believes that this provision of the Code has been satisfied by the Plan.

    1.3  Section 1123(b) of the Code.

Section 1123(b) of the Code contains five permissive provisions.

Section 1123(b)(1) of the Code provides that a plan may impair or leave any class of claims, whether secured or unsecured, or of interests unimpaired under the plan. All three Classes of the Plan - Classes 1, 2, and 3 – are impaired under the Plan.

Section 1123(b)(2) of the Code specifies that, subject to Section 365, a plan may provide for the assumption, rejection or assignment of any executory contract or unexpired lease not previously rejected. With regard to contracts and leases, the Plan provides that, on the Effective

Date, all of the Debtor's executory contracts and unexpired leases which are identified in Exhibit E attached to the Plan shall be deemed to be assumed by the Debtor and to become valid and binding executory contracts and unexpired leases of the Reorganized Debtor ("Initial Assumed Contracts and Leases").  By 5:00 p.m. PST on the day prior to the date of the Plan confirmation hearing, the Debtor shall file a pleading with the Court identifying any additional executory contracts and expired leases that the Debtor wishes to assume in the Case ("Additional Assumed Contracts and Leases").  All of the Debtor's remaining executory contracts and unexpired leases which are not either identified as Initial Assumed Contracts and Leases or identified as Additional Assumed Contracts and Leases shall be deemed rejected effective as of 11:59 PST on the Effective Date.

Section 1123(b)(3) of the Code specifies that a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate," and/or "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest."  There are no settlements and adjustments of claims to be included the Plan.  The Plan provides for the retention and enforcement by the Debtor to settle or readjust any claim or interest belonging to the estate.

Section 1123(b)(4) of the Code specifies that a plan may "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests."  This Section of the Code is inapplicable to the Debtor because the Plan does not provide for the sale of any property of the estate.  Therefore, the Plan complies with all of the provisions of Section 1122 and 1123 of the Code and, therefore, complies with Section 1129(a)(1) of the Code.

2.      Section 1129(a)(2) of the Code.

Section 1129(a)(2) of the Code provides that a court may confirm a plan only if "[t]the proponent of the plan complies with applicable provisions of the title."  The principal purpose of 11 U.S.C. § 1129(a)(2) is to insure that the plan proponent has "complied with the applicable provisions of §§1125 and 1126 regarding disclosure, plan solicitation, and rejections of the

Plan," <u>In re Castle Arch Real Estate Inv. Co., LLC</u>, No. 11-35082, 2013 WL 2467974, at *4 (Bankr. D. Utah June 7, 2013), and with the requirements of Section 1121 and 1127 of the Code. <u>In re Downtown Inv. Club III</u>, 89 B.R. 59, 65 (B.A.P. 9th Cir. 1988).

      2.1    <u>Section 1121 of the Code</u>.

Section 1121(c) of the Code provides that "[a]ny party in interest including the debtor, the trustee, a creditors' committee ..., may file a plan ... ." Since the Debtor is the proponent of the Plan, the requirements of Section 1121 of the Code have been satisfied.

      2.2    <u>Section 1125 of the Code</u>.

Section 1125(b) of the Code provides, in part, that:

> "An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at that time or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and hearing, by the Court as containing adequate information."

As the Debtor has undertaken a prepackaged plan process, the Court has not approved the Disclosure Statement relating to the Plan; however, the Debtor submits that the Disclosure Statement which contains detailed discussions of the Debtor's business, the history and events leading up to the Chapter 11, the terms of the Plan, and the process of confirming the Plan, contains adequate information pursuant to Section 1125(b) of the Code. Additionally, as evidenced by the Estler Declaration, a copy of the Plan, the Disclosure Statement, a cover letter and a ballot (*i.e.*, the Plan Package) were sent to each known creditor and party in interest in this case. The Debtor has therefore complied with the provisions of Section 1125 of the Code.

      2.3    <u>Section 1127 of the Code</u>.

Section 1127 of the Code sets forth certain requirements that a plan proponent must satisfy in order to modify a plan. Section 1127(b) of the Code authorizes a plan proponent to modify the plan at any time before confirmation of the plan provided the plan as modified

satisfies the requirements of Sections 1122 and 1123 of the Code.  A modification to a plan does not mandate "the preparation of a new disclosure statement and resolicitation of the plan".  In re American Solar King Corp. ("American Solar"), 90 B.R. 808, 823 (Bankr. W.D. Tex. 1988); see In re K.D. Co., Inc., 254 B.R. 480, 489 (B.A.P. 10th Cir. 2000) ("Renoticing modifications to a plan is not required if the modifications are immaterial."); In re Cramer, Inc., 100 B.R. 63, 67 (Bankr. D. Kan. 1989) ("In such a case, this Court and no doubt the majority of courts permit the debtor and major creditors to negotiate a change without the necessity of re-balloting, particularly where those parties affected by the change consent to the change and approve deviation from the rules.").  Additional disclosure to creditors is generally required "only when and to the extent that the debtor intends to solicit votes from previously dissenting creditors or when the modification materially and adversely impacts parties who previously voted for the plan." Solar King, 90 B.R. at 823.

Modifications to the Plan have occurred since the solicitation of votes on the Plan as to the terms of the financing, but these changes do not materially or adversely impact parties who previously voted for the Plan, and, in fact, the changes are more beneficial to general unsecured creditors (Class 2) since it allows for general unsecured creditors as a whole to receive more ownership interests in the Reorganized Debtor through less dilutive effect, and provides for Class 2 members to be entitled to the Claim Credit equal to their allowed claims which will be satisfied over time through Travel Points.

Other than the foregoing, there are no other modifications to the Plan.  The Debtor submits that these modifications to the Plan before confirmation of the Plan satisfy the requirements of Sections 1122 and 1123 of the Bankruptcy Code.

3.    Section 1129(a)(3) of the Code.

Section 1129(a)(3) of the Code provides that a court may confirm a plan only if the plan is proposed "in good faith and not by any means forbidden by law."  Bankruptcy Rule 3020(b)(2) provides that the Court may determine that a plan proponent proposed a plan in good faith and not by any means forbidden by law, without receiving evidence, if no party in interest

34

has timely objected to the plan proponent's good faith.  In re Warren, 89 B.R. 87, 91 (B.A.P. 9th Cir. 1988); In re Henricksen, 131 B.R. 467, 471 (Bankr. N.D. Okla. 1991).

Here, the Debtor has filed the Plan in good faith and has proposed the best terms possible for treating its creditors' claims under the dire circumstances currently facing the Debtor. Although the Commitment Letter Plan involves individuals who are insiders of the Debtor, there was no collusion of any kind involving the Debtor or any insider of the Debtor with regard to the Plan or any Plan terms.  The Debtor and its management aggressively solicited financing from all members and other parties, and reviewed all offers to determine whether they were in the best interests of creditors.  Mr. Berg and Mr. Estler, as member of the Boards of Directors of CH and VG recused themselves from voting on whether to approve the Commitment Letter Plan.

Absent the Commitment Letter Plan, the Debtor will run out of cash by or before the end of 2016, and will have to cease business operations.  If the business shuts down, no creditor is likely to recovery anything on their claims.  In good faith, the Debtor and its management have reached out to all members and scoured other sources for funding.  The Commitment Letter Plan reflects the best terms that the Debtor can obtain, in good faith, under the current circumstances, and, in fact, exceeds the Debtor's expectations as shown in the Reorganization Financing Plan.

4.      Section 1129(a)(4) of the Code.

Section 1129(a)(4) of the Code provides that a court may confirm a plan only if "[a]ny payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Court as reasonable."  Here, unless the Court authorized the payment of fees and expenses in connection with the employment of a professional, or pursuant to an order of the Court authorizing interim payment of fees and expenses to certain professionals, none of the professionals employed in the Debtor's bankruptcy case will be paid its outstanding post-petition, pre-Effective Date fees and expenses until such fees and expenses have been approved by the Court.

5.    <u>Section 1129(a)(5) of the Code</u>.

Section 1129(a)(5)(A)(i) of the Code provides that a court may confirm a plan only if the plan proponent discloses "the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer of voting trustee of the debtor . . . or a successor to the Debtor under the plan."  The Plan discloses the post-confirmation management structure of the Reorganized Debtor and the identities of those involved.  In particular, the Plan states that the initial senior management of the Reorganized Debtor will be identical to the current management of the Debtor, meaning that Pete Estler will serve as the initial Chief Executive Officer of the Reorganized Debtor.  The newly elected board will decide on a Chief Executive Officer going forward.

The initial manager of the Reorganized Debtor will be VG, which will have a Board of Directors consisting initially of Pete Estler, Ben Addoms, Bruce Barnet, Kevin McCarthy and Carl Berg – each of whom is currently serving as a member of CH's and VG's Boards of Directors.  These Board members will not receive any initial compensation for serving as members of the VG's Board of Directors.

As promptly as possible after the Effective Date of the Plan, the new shareholders of the Reorganized Debtor shall elect a Board of Managers consisting of five (5) directors subject to the following:

(a)    as long as any portion of the Loans made by the Lead Lender is outstanding, Lead Lender will have the right to elect three (3) of the five (5) directors on the Board of Managers ("<u>Preferred Managers</u>");

(b)    after all of the Loans made by the Lead Lender have been paid in full, the holders of Preferred A Shares will have the right to elect the Preferred Managers; and

(c)    notwithstanding anything to the contrary in any of the agreements pertaining to the Loans, if at the time of the election of the Board of Managers, CH is the only holder of Preferred A Shares, then all seats on the Board of Managers (including the Preferred Managers)

shall be elected by all shares entitled to vote (Preferred and Common) voting together as a single class.

Section 1129(a)(5)(A)(ii) of the Code requires that the appointment to, or continuance of a director, officer or voting trustee be "consistent with the interests of creditors and equity security holders and with public policy." In re Stratford Associates Ltd. P'ship, 145 B.R. 689, 696 (Bankr. D. Kan. 1992); Castle Arch Real Estate Inv., 2013 WL 2467974, at *6. In re Produce Hawaii, Inc., 41 B.R. 301, 304 (Bankr. D.. Hawaii 1984); In re Parks Lumber Co., Inc., 19 B.R. 285, 291 (Bankr. W.D. La. 1982). The proposed post-confirmation management structure of the Reorganized Debtor and the identities of the individuals involved is consistent with public policy and necessary for the Debtor to implement the strategic mergers and increase sales. Initially, given their familiarity and experience with the Debtor's business and operations, there are no persons better qualified than the current management team to continue to run the business of the Reorganized Debtor, and it would extremely difficult and disruptive if the current management team were not retained to transition the business post-confirmation. Under the current management and leadership, and despite the challenges of the travel industry over the years, the Debtor has been able to survive and provide service to its members. Therefore, the continuing services of the current management team are critical to the efficient administration of the estate, the implementation of the Plan, and are very consistent with the best interests of creditors, equity holders and with public policy.

In addition, and recognizing the change to the ownership structure of the Reorganized Debtor, the Plan provides for the eventual creation of a new Board of Managers, with members to be voted as specified under the Plan. This too, the Debtor submits, is consistent with public policy in that the new owners and groups of owners of the Reorganized Debtor will eventually, as they become organized, have a meaningful voice and votes with regard to the activities of the Reorganized Debtor.

Section 1129(a)(5)(B) of the Code provides that a Court may confirm a plan only if the plan proponent discloses "the identity of any insider that will be employed or retained by the

reorganized debtor, and the nature of any compensation for such insider." The Plan discloses that, the current management team of the Debtor will continue post-confirmation at the same rates as they were compensated prior to confirmation. Based on the foregoing, the Plan satisfies this requirement of the Code.

6.    Section 1129(a)(6) of the Code.

Section 1129(a)(6) of the Code requires that after confirmation of a plan, any governmental regulatory commission with jurisdiction "over the rates of the debtor has approved any rate change provided for in the plan ..." This Section of the Code is inapplicable since no governmental regulatory commission has jurisdiction over the rates the Debtor charges.

7.    Section 1129(a)(7) of the Code.

Section 1129(a)(7)(A) of the Code (referred to as the "best interest of creditors test") requires that, with respect to each impaired class under the Plan, each member of the class must either accept the Plan or receive under the Plan property having a value, as of the Effective Date, that is not less than the amount that such claim holder would receive if the Debtor's Chapter 11 case was converted to a Chapter 7 liquidation. This requirement has been satisfied.

The Plan contains 3 Classes, all of which are impaired. The impaired classes consist of Classes 1 (secured claim of CH), 2 (general unsecured creditors), and 3 (interest holder). Two of these impaired classes - Classes 1 and 2 have voted to accept the Plan. Class 3 receives nothing under the Plan, and, therefore, is deemed to have rejected the Plan. The Debtor must therefore satisfy the "best interest of creditors test" with respect to Class 3, and any member of Class 2 who did not vote to accept the Plan.

Under the Plan, general unsecured creditors receive their pro rata share of 52,500 Common Shares in the Reorganized Debtor plus they are entitled to the Claim Credit, and VG which is the only interest holder of the Debtor loses all prior ownership in the Debtor and receives nothing under the Plan. The Debtor submits that these creditors and VG still receive under the Plan property having a value, as of the Effective Date, that is not less than the amount

38

that such claim holder would receive if the Debtor's Chapter 11 case was converted to a Chapter 7 liquidation.

In a Chapter 7 liquidation, the estate has little to sell.  The estate owns no real property, and only has miscellaneous furniture, fixtures and equipment.  In addition, any net proceeds from the sale of any asset would first go to CH to satisfy its secured claim of approximately $3 million.  There is absolutely no question that, in a Chapter 7 liquidation, unsecured creditors and VG would receive nothing on their claims.

Even if the value of the Common Shares in the Reorganized Debtor is worthless, the unsecured creditors are not receiving less under the Plan than in a Chapter 7 liquidation. Likewise, VG receives nothing under the Plan and in Chapter 7; therefore, VG is not receiving less under the Plan than in a Chapter 7 liquidation.   Therefore, the Debtor submits that this requirement has been satisfied with respect to Classes 2 and 3.

8.      Section 1129(a)(8) of the Code.

Section 1129(a)(8) of the Code provides that a court may confirm a plan only if "[w]ith respect to each class of claims or interests: (A) such class has accepted the plan; or (B) such class is not impaired under the plan."   As aforementioned, there are three (3) impaired classes under the Plan:  Classes, 1, 2, and 3.  Classes 1 and 2 have each voted to accept the Plan.  Class 3 is deemed to have rejected the Plan.

The general unsecured creditors (i.e., Class 2) have voted to accept the Plan because far more than two-thirds in amount and one-half in number of the Class 2 claim holders that voted on the Plan voted to accept the Plan.

More specifically, and as demonstrated by the tabulation of ballots attached as **Exhibit B** to the Estler Declaration, a total of 539 Plan Packages were mailed to creditors in Class 2 which included all of the Debtor's current members and former members with deposit or other claims. The Debtor timely received ballots from 311 claimants, or 58% of the claimants who received the Plan Packages.  Of those who timely submitted ballots to the Debtor, 274 or 88% voted to accept the Plan.  Additionally, the total amount of the claims held by these claimants who voted

to accept the Plan is $67,155,919 or 87% of the total claims of the 311 claimants who timely submitted ballots on the Plan. In addition, CH has voted to accept the Plan.

Thus, under Section 1126(c) of the Code, all impaired classes have voted to accept the Plan except for Class 3 which is deemed to have rejected the Plan. Pursuant to Sections 1129(a)(8) and 1129(b) of the Bankruptcy Code, the Debtor has provided the necessary legal analyses below in Section B of this Discussion Section as they relate to Class 3.

      9.    <u>Section 1129(a)(9) of the Code</u>.

Section 1129(a)(9) of the Code provides that a court may confirm a plan only if the plan complies with the following:

      a.    Each holder of a priority claim under Section §507(a)(2) or 507(a)(3) of the Code must receive cash equal to the allowed amount of such claim or agree to a different treatment.

      b.    Each holder of a priority claim under Sections 507(a)(1), (4), (5), (6) or (7) of the Code must receive, on account of such claim:

      i.    deferred cash payments of a value, as of the effective date, equal to the allowed amount of such claim, if such class has accepted the plan; or

      ii.    cash on the effective date equal to the allowed amount of such claim, if such class has not accepted the plan.

      c.    Each holder of a priority claim under Section 507(a)(8) of the Code must receive, on account of such claim, regular installment payments in cash (i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claims, (ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303, and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)).

Under the Plan, each holder of an allowed administrative claim (i.e., claims arising under Section 507(a)(2) of the Code) will be paid in full upon the later of (i) the Effective Date and (ii) entry of an order of the Court approving payment of fees and expenses.

Under the Plan, each holder of an allowed priority claim (i.e., claims arising under Sections 507(a)(1), (4), (5), (6) or (7) of the Code), will be paid in full on the Effective Date of the Plan.   The Debtor does not believe it has any of these claims.

Under the Plan, each holder of a priority tax claim arising under Section 507(a)(8) of the Code will receive regular installment payments of a total value, as of the Effective Date, equal to the allowed amount of such allowed tax claims, over a period ending not later than five years after the Petition Date.  The Debtor does not believe that it has any priority tax claims.  To the extent there are any allowed Section 507(a)(8) priority tax claims, the full amount of such claims will be paid in equal quarterly payments with interest to accrue from the Effective Date at the statutory rate of interest (estimated to be 3% per annum) paid over a period of sixteen calendar quarters, payable by the last day of each such calendar quarter, with the first such payment to be due by the Effective Date.

Based upon the foregoing, the Plan satisfies the requirements of Section 1129(a)(9) of the Code.

10.    Section 1129(a)(10) of the Code.

Section 1129(a)(10) of the Code provides that a court may confirm a plan only if "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."  Section 1126(c) of the Code provides that "[a] class of claims has accepted a plan if such plan has been accepted by creditors ... that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors ... that have accepted or rejected such plan."  As set forth above, Classes 1 and 2, which are impaired under the Plan, have voted to accept the Plan.

11.     Section 1129(a)(11) of the Code.

Section 1129(a)(11) of the Code provides that a court may confirm a plan only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." In order to meet this feasibility standard, a debtor need only demonstrate that the plan has a "reasonable likelihood of success." Castle Arch Real Estate Inv., 2013 WL 2467974, at *9; In re Pike's Peak Water Co., 779 F.2d 1456, 1460 (10th Cir. 1985); In re Inv. Co. of The Sw., Inc., 341 B.R. 298, 311 (B.A.P. 10th Cir. 2006) ("When determining whether a plan is feasible, a bankruptcy court must carefully scrutinize the plan to determine whether it offers a reasonable prospect of success and is workable.").

There are two important aspects of a feasibility analysis. The first aspect considers whether the Reorganized Debtor will have enough cash on hand on the Effective Date to pay all the claims and expenses which are entitled to be paid on such date. The second aspect considers whether the Reorganized Debtor will have enough cash over the life of the Plan to make the required Plan payments.

On and after the Effective Date, the Plan does not require payments of cash to creditors on their pre-petition claims, but will require payments to satisfy allowed administrative claims. The Debtor will have sufficient cash on hand on the Effective Date from its revenue to make the payments required to be made on the Effective Date.

More importantly, the Loans will ensure that the Reorganized Debtor has enough working capital to operate after confirmation of the Plan and will not require further restructuring. The pro forma projections to the Plan illustrate that, upon confirmation and with its pre-petition liabilities shed, the Debtor will be able to operate as a healthy and adequately capitalized business in the future.

12.     Section 1129(a)(12) of the Code.

Section 1129(a)(12) of the Code provides that a court may confirm a plan only if "[a]ll fees payable under Section 1930, as determined by the court at the hearing on confirmation of

the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan." The Plan provides for all such fees and costs to be paid in full.

13.     Section 1129(a)(13) of the Code.

Section 1129(a)(13) of the Code provides that a court may confirm a plan only if "[t]he plan provides for the continuation after its effective date of payment of all retiree benefits ... for the duration of the period the debtor has obligated itself to provide such benefits." This provision is inapplicable to this case as the Debtor does not have any retiree benefits.

14.     Section 1129(a)(14) of the Code.

Section 1129(a)(14) of the Code provides that if the debtor is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the debtor has paid all amounts payable under such order or such statute for such obligation that first becomes payable after the date of the filing of the petition. This provision is inapplicable to this case because the Reorganized Debtor is not required by judicial or administrative order, or by statute, to pay a domestic support obligation.

15.     Section 1129 (a)(15) of the Code.

Section 1129(a)(15) of the Code provides that, in a case in which the debtor is an individual in which the holder of an allowed unsecured claim objects to the confirmation of the plan – (A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claims is not less than the amount of such claim, or (B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer. This provision is inapplicable to this case because the Reorganized Debtor is not an individual.

16.     Section 1129(a)(16) of the Code.

Section 1129(a)(16) of the Code provides that all transfers of property of the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the

transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.  The Debtor has no reason to believe that it has not complied with all applicable provisions of nonbankruptcy law that govern the sale or other transfer of estate property during this case.

**B.    The Plan Satisfies Sections 1129(a)(8) and 1129(b) of the Code.**

Section 1129(b)(1) of the Code provides that "if all of the applicable requirements of [Section 1129(a) of the Code] other than [Section 1129(a)(8)] are met with respect to a plan, the court, on request of the proponent of the plan, ***shall*** confirm the plan ... if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  These are commonly referred to as the cramdown provisions of the Code. The "cramdown" process in Chapter 11 is a way of imposing the terms of a plan on a dissenting class of creditors. 11 U.S.C. §1129(b).  As discussed below, these requirements are met in regard to Class 3.

The Debtor specifically requests confirmation of the Plan through cramdown, if necessary.

1.    The Applicable Standard.

a.    Unfair Discrimination Test.  The weight of judicial authority holds that a plan unfairly discriminates in violation of Section 1129(b) only if similar claims are treated differently without a reasonable basis for the disparate treatment.  See Castle Arch Real Estate Inv., 2013 WL 2467974, at *10; In re Genesis Health Ventures, Inc., 266 B.R. 591, 611-12 (Bankr. D. Del. 2001); In re Greater Bay Hotel & Casino, Inc., 251 B.R. 213, 228 (Bankr. D.N.J. 2000); see also In re Acequia, Inc., 787 F.2d at 1364 ("The Collier treatise states that this provision requires that a plan 'allocate' value to the class in a manner consistent with the treatment afforded to other classes with similar legal claims against the debtor.").

A plan of reorganization must separately classify nonpriority prepetition unsecured claims, priority claims, secured claims including secured setoff claims, and equity interests.  See Collier on Bankruptcy, Vol. 7, ¶1122.03[3], 1122-9 (16th ed.).  The general rule is that each

44

holder of an allowed claim secured by a security interest in specific property of the debtor should be placed in a separate class.  See Mokava Corp. v. Dolan, 147 F.2d 340 (2d Cir. 1945); Kyser v. MacAdam, 117 F.2d 232 (2d Cir. 1941).

        b.    Fair and Equitable Test.  Section 1129(b)(2) of the Bankruptcy Code states in relevant part that:

> "For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
> (A) With respect to a class of secured claims, the plan provides –
>
>     (i)  (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
>        (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
>
>     (ii)  for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or clause (iii) of this subparagraph; or
>
>     (iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2).  To determine whether a secured creditor has been provided the present value of its claim, the bankruptcy court must make a case-by-case determination of what interest the reorganizing debtor would have to pay a creditor in order to obtain a loan on equivalent terms in the open market.  See In re Hardzog, 901 F.2d 858, 860 (10th Cir. 1990) ("[W]e hold that in the absence of special circumstances, such as the market rate being higher than the contract rate, Bankruptcy Courts should use the current market rate of interest used for similar loans in the region."); In re Camino Real Landscape Maint. Contractors, 818 F.2d 1503, 1508

(9th Cir. 1987); In re Sunflower Racing, Inc., 226 B.R. 673, 686 (D. Kan. 1998).  In this regard, the Tenth Circuit has opined that "Bankruptcy Courts, counsel, lenders, and borrowers should have a familiarity with current interest rates on like-type loans and when a dispute arises, the market rate should be easily susceptible of determination by means of a hearing where each party is given the opportunity to submit evidence concerning the current market rate of interest for similar loans in the region.  In re Hardzog, 901 F.2d at 860.

All of the Classes are impaired under the Plan.  The impaired Classes 1 and 2 have voted to accept the Plan.  The impaired Class 3 has not voted to accept the Plan and is deemed to have rejected the Plan.  Therefore, the Debtor needs to satisfy the cramdown provisions of Section 1129(b) of the Code with respect to Class 3 which consists of VG, the only shareholder of the Debtor.

2.      Application of Section 1129(b) Standard to Class 3.

a.      The Plan Does Not Discriminate Unfairly Against, and is Fair and Equitable as to, Class 3.  In the Plan, Class 3 is comprised solely of the interest of VG in the Debtor.  All interests will be extinguished upon confirmation of the Plan and VG will receive nothing under the Plan.  Given that VG is an interest holder, it has been separately classified from creditors.  Additionally, the treatment afforded to VG under the Plan is consistent with the priorities of claims under the Bankruptcy Code and conforms to the absolute priority rule.  The terms proposed for VG does not unfairly discriminate against Class 3 in violation of Section 1129(b) and is fair and equitable with respect to Class 3.  Based on the foregoing, the Debtor submits that the cramdown requirement has been satisfied with respect to Class 3.

## VI.    CONCLUSION

Based on the foregoing, the Debtor respectfully requests that the Court enter an Order (i) finding that the Plan, as modified meets each and every requirement for confirmation pursuant to 11 U.S.C. Sections 1129(a) and (b); (ii) confirming the Plan as modified; and (iii) granting such other and further relief as is just and proper under the circumstances.

Dated this 12th of October, 2016.

**LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.**

By: _____ /s/ *Krikor J. Meshefejian* _____
　　　　Ron Bender (California State Bar No. 143364)
　　　　Monica Y. Kim (California State Bar No. 180139)
　　　　 Krikor J. Meshefejian (California State Bar No. 255030)
　　　　10250 Constellation Blvd., Suite 1700
　　　　Los Angeles, CA 90067
　　　　Tel: (310) 229-1234
　　　　Fax: (310) 229-1244
　　　　Emails: rb@lnbyb.com; myk@lnbyb.com;
　　　　　　kjm@lnbyb.com
　　　　Proposed Bankruptcy Counsel to Chapter 11 Debtor and Debtor in Possession

And

**SHAPIRO BIEGING BARBER OTTESON LLP**

By: _____ /s/ *Duncan E. Barber* _____
　　　　Duncan E. Barber, #16768
　　　　4582 South Ulster St. Parkway, Suite 1650
　　　　Denver, CO  80237
　　　　Tel:  (720) 488-0220
　　　　Fax:  (720) 488-7711
　　　　E-mail: dbarber@sbbolaw.com
　　　　Proposed Bankruptcy Counsel to Chapter 11 Debtor and Debtor in Possession

SBB0#436572